PETER J. ECKERSTROM, P.J., and J. WILLIAM BRAMMER, Jr., J., concur.

146 P.3d 1016

John KROMKO; Rachel Wilson; Adrian Duran; Sam Brown, on their own behalf and on behalf of all others similarly situated, Plaintiffs–Appellants,

v.

ARIZONA BOARD OF REGENTS, a constitutionally and legally established entity of the State of Arizona, and the State of Arizona, Defendants–Appellees.

No. 1 CA–CV 04–0250.

Court of Appeals of Arizona, Division 1, Department B.

Nov. 14, 2006.

Paul Gattone By Paul Gattone, Tucson, Attorneys for Plaintiffs–Appellants.

Terry Goddard, Attorney General By Bruce L. Skolnik, Assistant Attorney General, Daniel P. Schaack, Assistant Attorney General, Phoenix, Attorneys for Defendants–Appellees.

## OPINION

PORTLEY, Judge.

¶ 1 The question on appeal is whether the trial court erred by dismissing the complaint filed by four students from the University of Arizona who challenged the role of the Arizona Legislature and the Arizona Board of Regents ("Board")[1] that led to the nearly forty percent tuition increase for the 2003–2004 academic year. Because we find that the trial court erred in dismissing the claims against the Board, we reverse that portion of the court's order and remand the case.

---

1. The Board has historically been the sole state entity that has jurisdiction and control over the universities. Ariz.Rev.Stat. ("A.R.S.") section 15–1625(A) (2002); see 1945 Ariz. Sess. Laws, ch. 80, § 2; Bruce B. Mason & Heinz R. Hink, *Constitutional Government in Arizona* 187–88 (4th rev. ed.1972) (1963).

## FACTS AND PROCEDURAL BACKGROUND

¶2 During March 2003, the Board approved a 39.1% tuition increase for students enrolled in the state's university system. The Legislature kept the university system funding at the 2003 levels in its 2004 budget.

¶3 The students, after filing a notice of claim pursuant to A.R.S. § 12–821 and 12–821.01, filed their complaint seeking declaratory and injunctive relief, tuition reimbursement, and class certification for themselves and other university students. Specifically, they alleged that the Board's decision to raise tuition violated Article 11, Section 6, of the Arizona Constitution, which provides that "[t]he University and all other State educational institutions shall be as nearly free as possible." They also alleged that the Legislature's failure to increase funding for the university system violated Article 11, Section 10, of the Arizona Constitution, which provides, in part, that "the legislature shall make such appropriations, to be met by taxation, as shall ensure the proper maintenance of all state educational institutions, and shall make such special appropriations as shall provide for their development and improvement."

¶4 After venue was transferred to Maricopa County, the State filed a motion to dismiss. It alleged that the Legislature and Board were immune from suit. Specifically, it argued that the Legislature's appropriations for university education and the Board's tuition setting were "legislative acts entitled to absolute immunity." The State also argued that the Legislature and Board were immune because their decisions required the determination of fundamental government policy over which courts should not interfere.

¶5 The students argued that their claim was "merely the higher education counterpart of the school financing litigation that led to the decision of the Arizona Supreme Court in *Roosevelt Elem. Sch. Dist. No. 66 v. Bishop*," 179 Ariz. 233, 877 P.2d 806 (1994), and further argued that neither the Board nor the Legislature were immune from the lawsuit. The trial court subsequently found that the students "[did] not challenge the process

whereby the decisions were made to increase the tuition or fund the universities; they challenge the outcome." The court then found that the Board and Legislature were immune from suit and dismissed the complaint. The students appealed.

## DISCUSSION

¶6 We independently review whether the Legislature and the Board are immune from this lawsuit. *See State v. Glassel*, 211 Ariz. 33, 53, ¶78, 116 P.3d 1193, 1213 (2005); *Fairway Constructors, Inc. v. Ahern*, 193 Ariz. 122, 124, ¶6, 970 P.2d 954, 956 (App.1998). In reviewing the dismissal, we accept the truth of the complaint's allegations and recognize that dismissals "are disfavored and should not be granted unless it appears certain that a party would not be entitled to relief on its asserted claim under any state of facts susceptible of proof." *Ariz. Soc'y of Pathologists v. Ariz. Health Care Cost Containment Sys. Admin.*, 201 Ariz. 553, 557, ¶19, 38 P.3d 1218, 1222 (App.2002).

¶7 We start our analysis by examining *Bishop* because the students argued that their lawsuit was designed to challenge the educational funding decisions of the Board and Legislature, just as *Bishop* challenged the statutory scheme for financing public school education. In *Bishop*, parents and school districts argued, and our supreme court found, that the complex public school statutory financing scheme for school facilities violated the provision of Article 11, Section 1 of the Arizona Constitution that there shall be "a general and uniform public school system." *Bishop*, 179 Ariz. at 235, 242–43, 877 P.2d at 808, 815–16. It found that the state's financing scheme caused disparities among school districts and that "the districts are entitled to a declaration that the existing statutory scheme for the financing of public schools in Arizona fails to comply with [Article 11, Section 1] because it is itself the source of substantial nonuniformities." *Id.* at 243, 877 P.2d at 816. Consequently, the court held that "the Arizona Constitution requires the legislature to enact appropriate laws to finance education in the public schools in a way that does not itself create

substantial disparities among schools, communities or districts." *Id.*

¶ 8 Here, unlike *Bishop*, the students do not challenge the statutory financing scheme for the universities.[2] They have not pled that the current statutory scheme to raise revenue for the universities violates the provision of Article 11, Section 1 which requires that "[t]he legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system" or other constitutional provisions. Instead, they challenge the constitutionality of the actions of the Legislature and Board, arguing that Article 11, Sections 6 and 10 were violated when the Legislature failed to increase the university system appropriation and the Board raised tuition by nearly forty percent.

¶ 9 Article 11, Section 6 states, in pertinent part, that "[t]he University and all other State educational institutions shall be open to students of both sexes, and the instruction furnished shall be as nearly free as possible."

¶ 10 Article 11, Section 10, entitled "Source of revenue for maintenance of state educational institutions" provides that:

> The revenue for the maintenance of the respective State educational institutions shall be derived from the investment of the proceeds of the sale, and from the rental of such lands as have been set aside by the Enabling Act approved June 20, 1910, or other legislative enactment of the United States, for the use and benefit of the respective State educational institutions. In addition to such income the Legislature shall make such appropriations, to be met

by taxation, as shall ensure the proper maintenance of all State educational institutions, and shall make such special appropriations as shall provide for their development and improvement.

¶ 11 The two provisions provoked negligible attention during the adoption of the Arizona Constitution. *See The Records of the Arizona Constitutional Convention of 1910*, at 960 (John S. Goff ed., 1991); John D. Leshy, *The Making of the Arizona Constitution*, 20 Ariz. St. L.J. 1, 97 (1988). There is no historical record of the intent of the framers beyond the words of the constitutional provisions.[3]

¶ 12 Although the framers of our constitution left no historical note about Sections 6 and 10, our supreme court discussed the two constitutional provisions in *Board of Regents of University of Arizona v. Sullivan*, 45 Ariz. 245, 42 P.2d 619 (1935). In *Sullivan*, the Legislature enacted the Educational Institutions Act of 1934 which authorized the Board to issue and sell bonds to any federal agency to improve and enlarge the University of Arizona and accept grants from any federal agency. The Attorney General refused to certify that the bonds conformed to our constitution and state laws. Specifically, the Attorney General thought the 1934 act was unconstitutional because it was passed during a special session; contained more than one subject; would create a state indebtedness; would raise revenues differently than as mandated by Article 11, Section 10; and would violate Article 11, Section 6. *Id.* at 249–50, 42 P.2d at 621.

---

2. The statutory financial provisions are found at A.R.S. §§ 15–1661 to –1695 (2002).

3. Wyoming's Constitution was ratified in 1889, and contains the phrase "as nearly free as possible." The provision states, in relevant part, that:

> The university shall be equally open to students of both sexes ... and, in order that the instruction furnished may be as nearly free as possible, any amount in addition to the income from its grants of lands and other sources ... necessary to its support and maintenance ... shall be raised by taxation....

Wyo. Const. art. 7, § 16.

The Arizona phrase may have been a compromise between those who thought that a universi-

ty education should be free and those who recognized a need to set tuition. *Compare The Compiled Laws of the Territory of Arizona*, ch. 23, § 5, at 214 (1877) ("And the said university shall be open to all persons resident of this Territory without charge of tuition ...."), *with Revised Statutes of Arizona*, tit. LII, ch. 12, § 2, at 438–39 (Prescott, Ariz., Prescott Courier Print 1887) ("The fee of admission to the university shall never exceed the sum of twenty dollars, and the charge for tuition ... shall never exceed in one year ... fifty dollars...."). The Legislature continued to set tuition until 1992. *Compare The Revised Statutes of Arizona 1913: Civil Code*, tit. 42, ch. 3, § 4481, at 1456–57 (1913), *with* 1992 Ariz. Sess. Laws, ch. 307 (deleting the statutory language setting tuition).

¶ 13 The Board filed a mandamus action in the supreme court to require the Attorney General to certify that the bonds met the requirements of the Arizona Constitution and state law. *Id.* at 247–48, 42 P.2d at 620–21.

¶ 14 After the supreme court found that the 1934 act was constitutional, it stated that the revenue provisions of Article 11, Section 10 are not the exclusive methods for the maintenance, development, and improvement of universities. *Id.* at 262, 42 P.2d at 626. It found that:

> while [the mandate found in the second sentence of section 10] imports that the educational institutions of the state must be maintained and adequately developed and improved by taxation, [it] does not make that resource the exclusive method. It simply means that it shall be the duty of the legislature to make whatever provision is necessary for the proper and efficient functioning of these institutions, but does not deny the legislature, or the institutions with the legislature's consent, the right to resort to other sources of revenue than that of state taxation for that purpose. If the educational institutions are limited to the federal revenues mentioned, and to appropriations to be met by taxation, then they may not charge tuition or any fees or rentals, or receive donations or gifts, or charge for dormitory or athletic accommodations, etc. To hold [that] such institutions are confined to the two sources of revenue mentioned would lead to absurd results and give to the language of section 10, . . . a meaning that was never intended.

*Id.* at 262–63, 42 P.2d at 626.

¶ 15 The Attorney General also argued that the indebtedness created by the bonds would violate the provisions of Article 11, Section 6 which, he argued, requires that the instruction "shall be entirely free." The court noted that the constitutional provision provides that the "institutions shall furnish instruction 'as nearly free as possible'" and that, absent an argument that "the fees, rentals, etc., are excessive or other than reasonable, or are not as nearly free as possible," the argument is self-defeating. *Id.* at 263, 42 P.2d at 626.

¶ 16 *Sullivan* leaves us with two conclusions. First, the provision in Article 11, Section 6 that university instruction "shall be as nearly free as possible" does not mean that a university education will be free. It is not an inflexible mandate. Instead, the issue will always be whether the fees charged to attend an Arizona university "are excessive or other than reasonable" in light of the constitutional mandate.

¶ 17 Second, Article 11, Section 10 provides three broad methods to fund the maintenance of the university system: (1) the sale or rental of lands that the federal government gave the state at statehood; (2) direct taxation; and (3) "special appropriation as shall provide for the[ ] development and improvement" of the university system, which includes the constitutional authority of the Board to raise revenue by issuing bonds, or by setting tuition, fees, and rental rates. *See also John D. Leshy, The Arizona State Constitution: A Reference Guide* 253 (1993).

¶ 18 The students argue that the constitutional provisions require that the Legislature must appropriately fund the university system so that the tuition will be "as nearly free as possible." Specifically, they allege that because the appropriation for the university system in 2004 was the same as it was in 2003, the Legislature violated Article 11, Section 10. We disagree.

¶ 19 The plain language of Article 11, Section 10 does not require the Legislature to increase its appropriation to the university system or to keep tuition "as nearly free as possible." Instead, the constitutional provision requires the Legislature to provide for the maintenance of the university system by the sale or rental of certain land or by appropriation through taxation. The statutory provision which implements that constitutional provision, A.R.S. § 15–1661, sets the base amount for the maintenance of the universities. It states, "[t]here shall be appropriated in the general appropriation bill for each fiscal year a sum of monies not less than eighty-five one-hundredths of one mill on the dollar of the assessed valuation of all taxable property in the state for the improvement, support and maintenance" for the university system. A.R.S. § 15–1661(A).

¶ 20 In addition to those revenue sources, the Legislature has the power to designate special authority to the Board to raise funds for the development and improvement of the universities. It has done so by giving the Board statutory authority to "[f]ix tuitions and fees to be charged," A.R.S. § 15–1626(A)(5), and to issue bonds. A.R.S. § 15–1683.

¶ 21 The Legislature, in setting the annual appropriation for the university system, exercises its "power of the purse." *Reinhold v. Bd. of Supervisors*, 139 Ariz. 227, 232, 677 P.2d 1335, 1340 (App.1984). Although many, like the students, may believe the appropriation in any given fiscal year is insufficient, we have long recognized that "[u]nder our system of government, all power to appropriate money for public purposes . . . rests in the legislature." *LeFebvre v. Callaghan*, 33 Ariz. 197, 204, 263 P. 589, 591 (1928). The Legislature, "in the exercise of its lawmaking power, establishes state policies and priorities and, through the appropriation power, gives those policies and priorities effect." *Rios v. Symington*, 172 Ariz. 3, 6, 833 P.2d 20, 23 (1992).

¶ 22 The Legislature, in exercising the "quintessential legislative function" of passing a budget, *Rateree v. Rockett*, 630 F.Supp. 763, 771 (N.D.Ill.1986), *aff'd* 852 F.2d 946 (7th Cir.1988), is generally immune from judicial review. Courts, as our supreme court noted, "have no power to enjoin legislative functions." *Phoenix v. Superior Court*, 65 Ariz. 139, 144, 175 P.2d 811, 814 (1946). "A court . . . being vested with judicial, not legislative, powers, cannot properly interpose any obstacle to the exercise of the legislative discretion . . . ." *Id.* at 144–45, 175 P.2d at 814.

¶ 23 Here, after broadly reading the complaint, we find no allegation, or any reasonable inference within the complaint, that the Legislature did not minimally fund the university system in 2004 as constitutionally required. The students, at best, have alleged that the 2004 appropriation was insufficient to prevent an increase in tuition. The allega-

tion, however, does not imply that the Legislature did not meet its constitutional mandate. Consequently, the trial court correctly determined that the Legislature was immune from this suit.

¶ 24 We next address whether the Board is immune from suit. The students argue that our decision in *Zeigler v. Kirschner*, 162 Ariz. 77, 781 P.2d 54 (App.1989), precludes any argument that a state agency is immune from declaratory or injunctive relief. The Board, on the other hand, argues that it is immune because its obligation to set tuition is either a legislative act or involves fundamental governmental policy pursuant to A.R.S. § 12–820.01.

¶ 25 The Board is a recognized constitutional entity, Ariz. Const. art. 11, § 5, that derives its authority to operate the university system from the Legislature. *See* Ariz. Const. art. 11, § 1 ("The legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system, which . . . include: . . . 6. Universities. . . ."). *See generally Commc'ns Workers of Am. v. Ariz. Bd. of Regents*, 17 Ariz.App. 398, 399–400, 498 P.2d 472, 473–474 (1972).

¶ 26 The Board's authority to set tuition comes from statute. The Board "shall: 5. Fix tuitions and fees to be charged and differentiate the tuitions and fees between institutions and between residents [and] nonresidents." A.R.S. § 15–1626(A)(5). Moreover, the Board is also required to "adopt rules to govern its tuition and fee setting process." *Id.*

¶ 27 The Board's authority to set tuition is, however, not unlimited. Its authority is limited by the constitutional requirement that the university education "shall be as nearly free as possible." Although one can argue that the phrase "nearly free as possible" is aspirational because it is "an expression of good intentions, since the Legislature determines what is 'possible'," John P. White, et al., *A Guide to the Arizona Constitution* 135 (2d ed.1985),[4] *Sullivan* sug-

4. The Wyoming constitutional phrase "that the instruction furnished may be as nearly free as possible" was deemed to be advisory by the Wyoming Attorney General. Op. Wyo. Att'y Gen. 89–

**614**

gests that the constitutional provision could be violated if it is determined that the tuition, "fees, rentals, etc. are excessive or other than reasonable." 45 Ariz. at 263, 42 P.2d at 626. Consequently, a tuition increase could violate Article 11, Section 6 if it is found to be excessive or other than reasonable.

¶ 28 We turn, as a result, to whether the Board is immune as a matter of law. A state agency, like the Board, may be immune by statute. The absolute immunity statute, A.R.S. § 12–820.01, provides in relevant part that a "public entity shall not be liable for acts or omissions of its employees constituting either of the following: (1) The exercise of a judicial or legislative function. (2) The exercise of an administrative function involving the determination of fundamental governmental policy."

¶ 29 The statute does not state that a public entity cannot be sued at all for any claim. It prohibits any liability for acts and omissions that involve legislative or judicial functions, or the determination of fundamental governmental policy. In fact, we recognized that the statute did not preclude actions for declaratory or injunctive relief in *Zeigler.*

¶ 30 In that case, the plaintiffs filed an action against the director of the Arizona Health Care Cost Containment System (AHCCCS) for "declaratory and injunctive relief and restitution." 162 Ariz. at 78, 781 P.2d at 55. The trial court dismissed the complaint for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. *Id.* In reversing the trial court, we examined A.R.S. § 12–820.01 and found that the statute was "intended to apply only to actions against public entities and public employees for money damages." *Id.* at 84, 781 P.2d at 61. Consequently, we held that the AHCCCS director was not, as a matter of law, immunized from injunctive and declaratory relief. *Id.*

¶ 31 The Board contends that *Zeigler* is inapposite because it involved an administra-

tive decision, rather than legislative action. They contend that the public policy reasons for granting legislative immunity are stronger than those for granting administrative immunity, and that the legislative immunity is broader, including not only a prohibition against tort immunity, but also a prohibition against declaratory or injunctive relief.

¶ 32 The plain language of the statute does not, however, support the Board's argument. The Legislature, in enacting A.R.S. §§ 12–820.01 and 12–820.02, did not find stronger policy reasons for granting legislative and judicial immunity than for granting administrative immunity. Thus, the absolute immunity statute clearly differentiates between "the exercise of a judicial or legislative function" and "the exercise of an administrative function" by requiring the latter to "involv[e] the determination of fundamental governmental policy" in order to qualify for absolute immunity. The absolute immunity statute does not, however, distinguish between judicial and legislative immunity on the one hand, and administrative immunity on the other. An entity engaging in any of the protected functions is protected only from "liab[ility] for acts and omissions of its employees." A.R.S. § 12–820.01(A).

¶ 33 Moreover, the Board has previously been subject to a suit for declaratory judgment. In *Arizona Board of Regents v. Harper,* seven students sued the Board for a declaration that the one-year residency requirement was unconstitutional. 108 Ariz. 223, 224, 495 P.2d 453, 454 (1972). After a bench trial, the trial court found that the students were residents, "had been improperly charged nonresident tuition," and the residency requirement was unconstitutional; and it thus ordered that the students were entitled to a refund. *Id.* Our supreme court reversed the trial court's determination and found that the non-residency requirements were constitutional. *Id.* at 226–31, 495 P.2d at 456–61.

¶ 34 There is no hint in *Harper* that the Board was immune from declaratory judg-

016 (1989). Our Attorney General, however, has opined that [whether] tuition is "as nearly free as possible" is a "factual inquiry [that] cannot be determined as a matter of law." Op. Ariz. Att'y

Gen. I99–011 (1999). Although attorney general opinions are advisory only, they may be persuasive. *Ruiz v. Hull,* 191 Ariz. 441, 449, ¶ 28, 957 P.2d 984, 992 (1998).

ment actions. Additionally, we find nothing in the statutory immunity provisions which precludes the Board from being sued for a declaratory judgment suit alleging it violated our constitution. Consequently, the statutory immunity provisions do not preclude a suit for declaratory or injunctive relief.

¶ 35 The Board also argues that the concept of separation of powers, as embodied in Article 3 of the Arizona Constitution, requires that we interpret the absolute immunity statute to provide it legislative immunity from injunctive and declaratory relief as well as tort damages. *See* Ariz. Const. art. 3 ("The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and ... such departments shall be separate and distinct, and no one of the departments shall exercise the powers properly belonging to either of the others.").

¶ 36 Our courts have, over the years, entertained actions similar to this one. *See Bishop; Harper; Carpio v. Tucson High Sch. Dist. No. 1,* 111 Ariz. 127, 524 P.2d 948 (1974) (action seeking a declaration that the State must provide free textbooks to high school students). None of those cases were dismissed without developing a factual record. None of those cases have led to control, interference, or intimidation by the courts. Instead, the courts have been appropriately deferential to the discretion used by the other entities, stepping in only where necessary to protect constitutional rights. *See, e.g., Bishop,* 179 Ariz. at 242, 877 P.2d at 815–16 (declaring existing school financing scheme unconstitutional, but refusing to grant injunctive relief and leaving the Legislature to decide, in its discretion, how to remedy the situation); *Carpio,* 111 Ariz. at 128–29, 524 P.2d at 949–50 (upholding the Legislature's discretion to decide whether to provide free textbooks to high school students); *Harper,* 108 Ariz. at 231, 495 P.2d at 461 (holding that the Board was "perfectly within its rights" to classify plaintiffs as non-residents based on lack of proof; but stating that the Board must revise its procedures to comply with students' due process rights). Consequently, the separation of powers argument does not

require immunity from declaratory and injunctive relief.

¶ 37 The Board also argues that the students' request for reimbursement of the higher tuition rate must be dismissed because it is a "damages claim" and the Board is immune from such claims under A.R.S. § 12–820.01(A). The students contend that a demand for refund of money illegally collected and paid is not subject to the immunity statutes, citing *Shaw v. Phillips Crane & Rigging of San Antonio,* 636 S.W.2d 186, 188 (Tex.1982); *Legal Capital, LLC v. Medical Professional Liability Catastrophe Loss Fund,* 561 Pa. 336, 750 A.2d 299, 302 (2000) (holding that sovereign immunity does not apply where plaintiff seeks a declaration that it has a right to receive funds from the state agency); and *Greyhound Welfare Foundation v. Mississippi State University,* 736 So.2d 1048, 1049 (Miss.1999) (suit seeking return of property wrongfully withheld is not the same as a suit for money damages).

¶ 38 The students are only seeking a refund of tuition fees that they allege were unconstitutionally imposed. They do not seek other monetary damages such as lost wages, damages for physical pain or emotional distress, or even prejudgment interest on the amount allegedly owed. Mindful that immunity provisions are to be construed narrowly, *see Doe ex rel. Doe v. State,* 200 Ariz. 174, 176, ¶ 4, 24 P.3d 1269, 1271 (2001) ("[A]s this court has emphasized, governmental liability is the rule in Arizona and immunity is the exception.... We therefore construe immunity provisions narrowly." (citation omitted)), we conclude that the request for a refund of unconstitutionally imposed tuition fees is not a claim for money damages that falls within the prohibition on holding a public entity "liable" for the acts and omissions of its employees.

¶ 39 Finally, we review whether the students have alleged a claim. They have alleged that the tuition increases "have led to increasingly unaffordable tuition levels and violate [their] right ... to a university education that is 'as nearly free as possible.'" The allegation raises the question of whether the tuition increase was "excessive or other

than reasonable." The Board may be able to factually demonstrate that the tuition increase was reasonable given the factors that it uses to determine tuition. We, however, cannot say that as a matter of law that the complaint alleging a constitutional violation does not state a claim upon which relief can be granted. Consequently, the trial court erred in concluding that the Board was immune.

## CONCLUSION

¶ 40 Based on the foregoing reasons, we affirm the trial court's decision dismissing the claims against the Legislature, reverse its decision finding that the Board is immune, and remand the matter.

Concurring: G. MURRAY SNOW, Judge.

IRVINE, Judge, concurring in part and dissenting in part.

¶ 41 I agree with much of the majority's decision. I agree that the Legislature is entitled to absolute immunity for its appropriation decisions. I disagree, however, with the majority's conclusion regarding the claim for declaratory and injunctive relief against the Board of Regents. The complaint fails to allege facts sufficient to show that the Board has exceeded the broad discretion given to it to set tuition "as nearly free as possible." Therefore, the complaint was properly dismissed.[5]

¶ 42 The root of the majority's decision is its reluctance to find that a provision of the Arizona Constitution can never be judicially enforced. I share this concern and agree that there may be a time when the Board has so plainly disregarded the direction of the constitution that judicial intervention is warranted. When that time will be, or what actions of the Board will trigger such intervention, are not, however, issues raised in this case.

¶ 43 The constitutional provision at issue here gives the Board, acting under the au-

thority of laws passed by the Legislature, enormous discretion in setting tuition. To the extent "nearly free" and "as possible" impose obligations on the Board, they plainly do not establish any specific limits on the level of tuition to be charged. The language implicitly recognizes that setting tuition involves balancing considerations beyond the financial impact on students, such as the revenues, expenses, and goals of the universities. It is inevitable that there will be disagreement regarding these considerations and the law leaves it to the Board to set the balance. As a result, setting tuition becomes a political question that is not suitable for judicial resolution. *See The Forty–Seventh Legislature v. Napolitano,* 213 Ariz. 482, 143 P.3d 1023, 486 Ariz. Adv. Rep. 36, ¶ 7, (Sept. 12, 2006) (" 'Political questions,' broadly defined, involve decisions that the constitution commits to one of the political branches of government and raise issues not susceptible to judicial resolution according to discoverable and manageable standards."). Because the Board is given this broad discretion, it is not enough for someone who disagrees and files a lawsuit to simply allege a violation of the constitution. Unless facts are adequately alleged in the complaint showing that the Board has acted outside the scope of its discretion, the Board should not be required to justify its budgetary decisions in court.

¶ 44 The students in this case allege that the Board acted wrongfully in several ways. First, the Board increased tuition to unaffordable levels. Second, the increases were approved with no financial analysis and based on arbitrary dollar requests from the university presidents. Third, the tuition increase was justified as necessary to pay off debt for construction, and such use of tuition funds is not appropriate. Fourth, higher tuition will be used to fund need-based financial aid.

¶ 45 The students do not argue that any of these acts standing alone is unlawful. In effect, they recognize that no law requires

---

5. Although the issue framed by the parties is whether absolute immunity applies, appellate courts will "affirm where any reasonable view of the facts and law might support the judgment of the trial court." *City of Phoenix v. Geyler,* 144

Ariz. 323, 330, 697 P.2d 1073, 1080 (1985). The majority recognizes this by addressing whether the students have alleged a claim. *See supra* ¶ 39.

detailed financial analysis,[6] and the Board may choose to increase tuition, pay off debt, and fund financial aid. The students argue instead that these acts violate the constitutional mandate that university education be "as nearly free as possible." They never articulate how high tuition should be, what would be an appropriate use of tuition revenues, or how a court is to go about determining the appropriate level of tuition.

¶ 46 The Arizona Supreme Court rejected similar arguments in *Sullivan.* 45 Ariz. at 263, 42 P.2d at 626. The legislation at issue in that case authorized the Board to incur debt to fund construction and pledge revenue, including fees and other charges, to secure the debt. As the majority notes, *Sullivan* expressly held that a university education need not be free. *Id.* The supreme court also implicitly rejected the argument that charging fees to pay debt violated the requirement that instruction be "as nearly free as possible." *See id.* The court did not require further factual development or litigation; it simply ruled that there was no violation under the facts alleged. The same result is required here. The fact that some of a tuition increase is used to pay for construction debt or provide for financial aid for others is simply inadequate to support a claim that the Board has exceeded its discretion.

¶ 47 It is unfortunate, but not surprising, that higher tuition makes it more difficult for some students to afford university instruction. Nevertheless, once it is acknowledged that tuition may be charged, a conclusion required by the holding in *Sullivan,* merely alleging that a tuition increase makes a university education less affordable is not enough to raise a constitutional question. In *Carpio,* 111 Ariz. at 128–29, 524 P.2d at 949–50, the supreme court held that Article 11, Section 6 of the Arizona Constitution does not require high schools to supply free instruction and textbooks to indigent students, "although they could be if the Legislature in its discretion saw fit to do so." If the discretion encompassed by "as nearly free as possi-

ble" includes not supplying instruction and textbooks to indigent students, it must necessarily include the Board's decision to increase tuition, even if doing so reduces the affordability of instruction for some students.

¶ 48 The majority concludes that the students' allegation that the tuition increases "have led to increasingly unaffordable tuition levels" adequately raises a constitutional question because *Sullivan* stated the test is whether the fees are "excessive or other than reasonable." What *Sullivan* actually said was that there was no suggestion in that case "that the fees, rentals, etc., are excessive or other than reasonable, or are not as nearly free as possible." 45 Ariz. at 263, 42 P.2d at 626. I do not read *Sullivan* as substituting an "excessive or other than reasonable" standard for the express words of the constitution. The words "excessive" and "reasonable" imply that there is some level of tuition that a court may objectively find to be correct. Given that setting tuition is a political question, I do not believe this to be the case.

¶ 49 In setting tuition the Board must make subjective, policy choices that are not readily subject to judicial review. Money is fungible, so an inquiry into the "reasonable" level of tuition will necessarily require a broad inquiry into the finances of the universities. Arguments will no doubt be made that tuition increases can be avoided, or even that tuition can be reduced, if expenses and costs are reduced. Questions will arise such as whether it is reasonable to open a new campus, start a new program, increase research funds, or give a raise to university presidents. These are not questions that a court is qualified to answer. Yet this is what the trial court will be asked to do if this case is remanded for further litigation.

¶ 50 The degree of discretion granted by the constitution to the Legislature and Board over university finances distinguishes this case from other cases in which declaratory and injunctive relief claims have been entertained. *See Bishop,* 179 Ariz. 233, 877 P.2d

---

6. The Board is required by law to follow certain procedures in setting tuition. A.R.S. § 15–1626(A)(5). The trial court found that the students "do not challenge the process whereby the

decisions were made to increase the tuition or fund the universities; they challenge the outcome."

**618**

806 ("uniformity" provided an objective standard against which the courts could measure any plan developed by the Legislature); *Harper,* 108 Ariz. at 225, 495 P.2d at 455 (issue was not whether the Board exceeded its discretion, but whether the constitutional provisions barred discrimination); *Carpio,* 111 Ariz. at 128–29, 524 P.2d at 949–50 (concluding that "the words 'as nearly free as possible' do not require that either [instruction or textbooks] be provided without charge although they could be if the Legislature in its discretion saw fit to do so"). In *Zeigler,* the primary case relied upon by the students and the majority, the plaintiffs argued the agency's requirements violated specific statutes and were "beyond the director's power to adopt or enforce." 162 Ariz. at 84, 781 P.2d at 61. Here, in contrast, it cannot be disputed that the Board has the power to set and increase tuition.

¶ 51 As I stated above, there may someday be a case in which a plaintiff can allege facts sufficient to raise a colorable claim that there has been a violation of the constitutional requirement that instruction be "as nearly free as possible." The claim may be that students are required to pay 100% of their education costs, or that Arizona's university tuition is among the top of comparable universities. In any event, the facts alleged must go beyond a bare allegation that the Arizona Constitution has been violated. The allegations must contain facts that, if proven, would establish that the Board has exceeded its broad discretion to set tuition. Without such plain allegations, the complaint merely asks us to second-guess a political decision that is not ours to make.

¶ 52 In this case, the complaint fails to support a conclusion that the Board has exceeded its discretion. Therefore, Plaintiffs failed to state a claim upon which relief could be granted and the trial court properly dismissed the complaint.